No. 26,533.

PARKER CORN COMPANY, *Appellee*, v. CHICAGO, BURLINGTON
& QUINCY RAILROAD COMPANY, *Appellant.*

SYLLABUS BY THE COURT.

1. CARRIERS—*Liability for Injury to Goods—Loss Due to Inherent Nature—Agreement to Recondition.* In an action for damages to a carload of corn shipped from Cedar Bluffs to Kansas City, and reconsigned therefrom to Tulsa, where, through no external cause or fault of the defendant carrier, the corn on its arrival at Kansas City was found to be heating and required to be sent to an elevator to be reconditioned before being forwarded to final destination, evidence was competent to show the oral agreement between the plaintiff holder of the bill of lading and the defendant railroad as to what should be done with the corn, and *held,* that the evidence did not show that the railroad company undertook the task of reconditioning the corn, nor that the railroad agreed to have the corn reconditioned, but that the plaintiff itself had made arrangement with an elevator company for that service; and *held also,* that where the heating of the corn was caused by the inherent character of the property, and not because of any fault of the carrier nor because of any extraneous agency operating on the corn while it was in the carrier's custody, it was not the carrier's duty to cause the corn to be reconditioned at Kansas City.

2. SAME—*Discrimination—Agreement to Recondition Corn.* Rule followed that whatever special services a railway carrier may extend to a shipper of goods must be open to all shippers alike, pursuant to freight tariffs and schedules of charges for such services filed with the public service commission and the interstate commerce commission; and *held,* that the alleged agreement for the special service of reconditioning the corn by the railway company, if proved, would have been unenforcible for want of conformity with pertinent state and federal statutes requiring filing of tariffs or schedules of charges for such special service.

3. SAME—*Liability for Injury to Goods—Loss Due to Inherent Nature—Contributing Negligence.* Where a carload of corn en route by railroad carrier develops heating because of its inherent tendencies, and not through any extraneous force operating upon the corn during its transportation by rail nor because of any fault of the carrier, the railroad company is not liable for loss or damage to the corn; but if negligent delay of the carrier in handling such defective corn at a railway terminal en route, or negligence in transferring such corn to the connecting carrier who was to dispatch it to destination commingling with the infirmity in the corn contributes in part to the loss and damage, the railway carrier is liable.

4. SAME—*Action for Injury to Goods—Instructions.* Error assigned on the instructions considered and in part sustained and in part overruled.

Carriers, 10 C. J. pp. 107 n. 67, 121 n. 24, 122 n. 25 *et seq.,* 305 n. 62, 385 n. 10, 389 n. 97, 391 n. 30, 394 n. 61, 472 n. 2, 480 n. 90, 92; 19 A. L. R. 982; 25 A. L. R. 201; 4 R. C. L. 599. Trial, 38 Cyc. p. 1927 n. 83.

5. TRIAL—*Verdict—Special Findings.* Record examined and held that defendant was not entitled to judgment on the special findings of the jury.

Appeal from Wyandotte district court, division No. 1; EDWARD L. FISCHER, judge. Opinion filed March 6, 1926. Reversed.

*H. M. Langworthy, Byron Spencer* and *Frank H. Terrell,* all of Kansas City, Mo., for the appellant; *H. J. Nelson,* of St. Joseph, Mo., of counsel.

*William K. Ward* and *Grant W. Harrington,* both of Kansas City, for the appellee.

The opinion of the court was delivered by

DAWSON, J.:   This was an action for damages to a carload of corn because of defendant's alleged negligence in transporting and handling it en route when it was discovered that the corn was heating and had to be sent to an elevator for reconditioning.

The main facts were these: In November, 1923, at Cedar Bluffs, Kan., defendant received for shipment a carload of corn consigned to Kansas City, Mo. The bill of lading with draft drawn attached bore the memorandum, "Notify the Parker Corn Company, Kansas City, Missouri." Before arrival of the corn, the Parker Corn Company had bargained for it and resold it to a buyer in Tulsa, Okla. On November 13, 1923, the draft was presented to and paid by the Parker Corn Company, which then surrendered the bill of lading to the defendant railway company, receiving in lieu thereof a reconsignment bill of lading for the shipment of the corn to its own order at Tulsa, Okla., with the instruction, "Notify Binding-Stevens Company." The corn arrived in defendant's railroad yards in Kansas City on November 15, 1923, where it was inspected by official inspectors of the state of Missouri, who found and reported to the Parker Corn Company that the shipment was "Sample Corn, Heating." The Parker Corn Company notified the defendant of this fact by telephone and requested that the carload be sent immediately to an elevator designated by plaintiff for reconditioning. Defendant agreed to this request but delayed two days before complying therewith. On November 17, 1923, defendant moved the car to an elevator, but nothing effective was done to the corn, if indeed it received any treatment at all. The Missouri grain officials made a second inspection of the corn after it had been to the elevator for treatment and again found it "heating." Without apparent excuse, defendant let the carload of corn remain in

its yards in Kansas City for three days more, until November 20, when it delivered the shipment to another railway carrier for transportation to Tulsa, where it arrived on November 22. The Binding-Stevens Company of Tulsa, who was the party designated in the bill of lading to be notified on arrival of the shipment, inspected the corn and declined to accept it because of its deteriorated condition; and ere a buyer was found, which was on November 26, the corn was "hot and molding," and no longer marketable, and had to be sold as damaged grain for the best obtainable offer, which satisfied the freight charges and left a balance of $100.17, which was tendered to and declined by the Parker Corn Company.

This lawsuit followed. Plaintiff's petition recited all the facts, charging negligence on the part of the railway company for unnecessary and unreasonable delays in transportation, and also because of negligence in the matter of carrying out its agreement to send the corn to an elevator in Kansas City for reconditioning and in failing to have the corn properly reconditioned to check its heating before reloading and forwarding it to Tulsa.

The jury returned a verdict for $1,050.08 in favor of plaintiff, and answered special questions, some of which read:

"Q. 6. Was the corn in car 111234 C. B. & Q. found to be heating by the Missouri Grain inspection department as a result of its yard inspection? A. Yes.

"Q. 7. Was the information that the corn in car 111234 C. B. & Q. was heating and not in condition for further shipment without treatment furnished to the defendant by the plaintiff? A. Yes.

"Q. 8. If question No. 7 is answered in the affirmative, then state when and how the plaintiff furnished such information to the defendant. A. By telephone and letter.

"Q. 9. Did the defendant agree with the plaintiff that it would have car 111234 C. B. & Q. sent to an elevator and the grain conditioned? A. Yes.

"Q. 10. Did the defendant cause car 111234 C. B. & Q. to be switched to the Murray Elevator? A. Yes.

"Q. 11. Was the corn in this shipment still heating when it was put back into the car at the Murray Elevator and the shipment again received into its possession by the defendant? A. Yes.

"Q. 12. Was the corn in car 111234 C. B. & Q. properly conditioned in Kansas City to prevent further deterioration? A. No.

"Q. 13. If the corn in car 111234 C. B. & Q. had been properly conditioned in Kansas City, how much of it could have been saved from further deterioration? A. Possibly all. . . .

"Q. 15. Was the defendant negligent in not having the corn in car 111234 C. B. & Q. conditioned at Kansas City to prevent further deterioration? A. Yes."

Defendant filed a motion to set aside the answers to special questions 9 and 15, for the reason that they were contrary to an instruction which the court had given to the jury. The instruction touching this phase of the lawsuit read:

"5. If you find from the evidence that the damage, if any, to the carload of corn in question was caused solely by the failure of the elevator company referred to in the evidence to properly dry and handle the corn after it was placed at the elevator by the defendant, and that the defendant was not guilty of negligence which contributed as a proximate cause of such damage, substantially in the manner alleged by the plaintiff in its petition, then you cannot find in favor of the plaintiff in excess of the amount of $100.17."

The motion to set aside these answers was overruled; and defendant filed a motion to set aside the general verdict and to enter judgment in its behalf on the special findings of the jury in response to questions 11, 12 and 13, on the assumption that in the light of the court's instruction quoted above, the jury's answers were tantamount to a finding that the sole cause of damage to the corn was the failure of the elevator company to properly recondition it. This motion was overruled, and judgment was entered for plaintiff according to the general verdict.

Defendant appeals, assigning various errors, which will be noted as presented.

It is argued, first, that it was error to permit testimony of the oral agreement alleged in plaintiff's petition to the effect that the railway company undertook the task of reconditioning the corn. Defendant suggests that if such agreement were made it would not be binding, because a railway carrier could not undertake that service under any special contract with plaintiff. This legal point need not be decided, because upon careful analysis the evidence does not show that such was the nature of the agreement between plaintiff and the carrier. Plaintiff's officer and agent who made the agreement by telephone with the company that the carload of corn should be sent to an elevator for reconditioning wrote to the defendant confirming that agreement, thus:

"Per our agreement you are to set it to the Murray Elevator to have it handled, we to pay the elevation. We have taken it up with the Norris Grain Company and they state they will handle it when it is set to the house. Also confirm your statement that it will be set there for the company's convenience."

This letter shows what the agreement with the railroad company was. Defendant had agreed to set the car at the Murray elevator and the letter gives further enlightenment on the important point

that not only was there no agreement that the railway company should recondition the corn, but that another party equipped to do that work, the Norris Grain Company, owner of the Murray elevator, had undertaken to do it pursuant to an arrangement between it and plaintiff's officer. Not only did this letter of plaintiff's officer disclose the facts as to the agreement between the plaintiff and defendant, but there is merit in defendant's argument that the railway company had neither duty nor power to undertake the task of reconditioning the grain itself. A railway carrier, state or interstate, is not equipped for such tasks; it has no published and approved schedules of charges for such services; and it could not undertake for plaintiff the task of reconditioning this carload of grain for the defective condition of which it was in no way responsible, unless it were prepared to serve all patrons alike who might demand such service at its hands. (See Railroad and Public Utilities Act, R. S. 66-140, 153, 154, 171, 177; Interstate Commerce Act, §§ 3, 6 and 10, U. S. Comp. Stat. 1918, §§ 8565, 8569, 8574; *Mollohan v. Railway Co.*, 97 Kan. 51, 154 Pac. 238, and notes thereto in L. R. A. 1918A, 185 *et seq.; Railway Co. v. Stannard & Co.*, 99 Kan. 720, 162 Pac. 1176; *Easdale v. Railway Co.*, 100 Kan. 305, 308, 164 Pac. 164; *Kennedy v. Railway Co.*, 104 Kan. 129, 133, 79 Pac. 314; *Farmers Grain Co. v. Atchison, T. & S. F. Rly. Co.*, 120 Kan. 21, 28, 242 Pac. 151.)

See, also, annotations in 19 A. L. R. 982.

It thus appears that while defendant's objection to the evidence touching what the railway company agreed to do cannot be sustained, that evidence did not show that the railway company itself had agreed to perform the service of reconditioning the corn, nor that it agreed to see that it should be done by another; so that we need occupy no more space over the question whether the railway company itself could have lawfully undertaken the service of treating the grain; and we think the cases cited by plaintiff touching the duty of a railway carrier to avert or minimize loss or damage to property intrusted to it for transportation are not in point. These cases deal with shipments of property subjected to flood, fire, collision or other extraneous forces which may affect the property while in the carrier's custody. Of course, it is the carrier's general duty to all shippers to take diligent, proper and reasonable precautions to prevent needless losses for which it is in any way responsible, but it is not responsible for loss or damage arising from some defect or tendency inherent in the property itself and which did not

arise from any act or omission of the carrier. In this case the heating of the corn was not caused by any act or omission of the carrier. The corn heated because of some defect inherent in it, not because of some extraneous circumstance which with diligence the carrier could have averted, nor because of any incident or mishap which befell the corn while in transit. If the carload of corn had been exposed to rain or flood—an extraneous force operating on the grain while in the carrier's custody which would set in motion the corn's inherent tendency toward heating—it might have been the carrier's duty to protect the corn, so far as practicable, from further deterioration. But it is conceded that the heating did not have its inception through any fault of the carrier. In *Faucher v. Wilson*, 68 N. H. 338, the action was against a truckman for the loss of a hogshead of molasses while being transported by the truckman. It developed that the hogshead burst by reason of the fermentation of the molasses, and it was held that whether the truckman was a common carrier or not he was not liable for such a loss which happened by the operation of natural causes. This principle is recognized in *Ship Howard, &c., et al. v. Wissman*, 59 U. S. 231, 15 L. Ed. 363; and in *Janney v. The Tudor Company*, 3 Fed. 814. In Story on Bailments, 5th ed., 518, 519, it is said:

"§ 492a. But although the rule is thus laid down in general terms at the common law, that the carrier is responsible for all losses not occasioned by the act of God, or of the king's enemies; yet it is to be understood in all cases, that the rule does not cover any losses, not within the exception, which arise from the ordinary wear and tear and chafing of the goods in the course of their transportation, or from their ordinary loss, deterioration in quantity or quality in the course of the voyage, or from their inherent natural infirmity and tendency to damage, or which arise from the personal neglect, or wrong, or misconduct of the owner or shipper thereof. Thus, for example, the carrier is not liable for any loss or damage from the ordinary decay or deterioration of oranges or other fruits in the course of the voyage, from their inherent infirmity or nature, or from the ordinary diminution or evaporation of liquids, or the ordinary leakage from the casks in which the liquors are put, in the course of the voyage, or from the spontaneous combustion of goods, or from their tendency to effervescence or acidity, or from their not being properly put up and packed by the owner or shipper; for the carrier's implied obligations do not extend to such cases."

In 10 C. J. 121, 122, the rule is thus stated:

"Where the destruction of or the injury to the goods is due to their inherent nature and qualities, or to defects therein, the carrier is not liable, if its own negligence did not occasion or contribute to the injury. With respect to

perishable goods which themselves contain the elements of destruction governing their loss or deterioration, the carrier is not an insurer, and is no more liable for destruction or injury resulting solely from the inherent infirmity of the goods than for loss entailed solely by an act of God or of the public enemy, or by the carelessness of the shipper. Thus the carrier is not liable for loss or injury due solely to such causes as fermentation, decay, spontaneous combustion, effervescence, putrefaction, or explosion. The measure of the carrier's duty is to exercise reasonable care and diligence to protect the goods from loss or injury while in its custody, and it is liable for only such deterioration as is attributable to its negligence. . . . It may perhaps also be stated as a general proposition that the carrier is not liable for loss happening from the operation of natural causes without negligence or fault of the carrier."

But a distinction is made in the cases where the damage was occasioned in part by inherent infirmity of the property and in part by the carrier's negligence. In such cases the carrier is liable. To this effect was the case of *Chouteaux v. Leech & Co.*, 18 Pa. St. 224, where packages of furs became wet in transit, and it was held that it was the duty of the carrier to have them opened and dried. In *Baltimore and Ohio R. R. Co. v. Keedy and Snyder*, 75 Md. 320, 23 Atl. 643, the action was one for damages to a carload of wheat which had been exposed to a flood while standing on a sidetrack. One element of negligence urged against the carrier and sustained by the court was based on the fact that while the flood water only rose a few inches in the car, defendant did nothing to minimize the damage bound to flow from such wetting. The door was never opened, though the car remained there some eight days, and the wheat was substantially destroyed. It was held that it was proper to allow the jury to determine whether defendant's agents could not, by the use of ordinary diligence and care, have removed and saved some of the wheat from destruction.

In our own case of *Poultry and Egg Co. v. Railroad Co.*, 113 Kan. 646, 215 Pac. 1020, damages were based upon the cost of reconditioning a carload of eggs, where the loss flowed in part from the nature of the property and partly from negligence of the carrier in handling the eggs in transit.

In 10 C. J. 122 the rule of liability where the damage is caused partly by the inherent tendency of the property to deteriorate and partly by contributory negligence of the carrier is thus stated:

"Nevertheless, . . . the exemption on account of the infirmity of the goods obtains only where the loss is solely attributable to such infirmity, for if the carrier's negligence commingles with the infirmity and contributes in part to the damage, liability is entailed therefor against the carrier for his negligent conduct."

The foregoing authorities, which might be indefinitely extended if our limited time would permit us to pursue and analyze them, likewise dispose of appellant's contention that the court should have directed a verdict for plaintiff for $100.17 as tendered by defendant, being the net balance remaining from the sale of the damaged corn after paying freight charges. We cannot say judicially, and the jury did not squarely determine the controverted issue of fact, whether the railway company's delay in handling the car in Kansas City and delay in delivering it to the connecting carrier for transportation to Tulsa did or did not contribute to the loss and damage to the corn. The jury did find that "possibly all" of the corn could have been saved from deterioration if it had been properly reconditioned in Kansas City. That point is certainly susceptible of proof by competent evidence and it should be definitely decided by a jury.

Defendant's main complaint of the instructions is that they largely ignored the pertinent law covering the alleged negligence of the carrier as pleaded in plaintiff's petition, i. e., negligence in setting the carload of corn at the Murray elevator, negligence in failing to recondition the corn or to cause it to be reconditioned, and negligence in delivering the carload to the connecting carrier at Kansas City. In part the criticism of the instructions is well-founded. The instructions stated the burden of proof resting on the plaintiff correctly, but they were erroneous in so far as they defined the carrier's liability without taking into account the admission that the car had been promptly dispatched to Kansas City from Cedar Bluffs, and that the heating of the corn was not caused by any external force nor through any act or omission of the carrier while it was en route to Kansas City.

Complaint is made of instruction No. 6. It need not be reproduced. It substantially stated the law, and accords quite closely with our excerpt from 10 C. J. 122 last above quoted.

In this case it was the duty of defendant to promptly set the carload of heating corn to the elevator to be reconditioned. Two days elapsed before that was done. Was that negligence? A jury question. After the corn had been sent to the elevator, and went through the pretended reconditioning and was presumably ready to be transferred to the connecting carrier, defendant delayed three more days before delivering the carload to the carrier who was to haul it to Tulsa. Was that negligence? A jury question. If these

few days of delay in Kansas City constituted negligence, did such negligent delay commingling with the infirmity in the corn contribute in part to the loss and damage sustained by the plaintiff? Again, a jury question.

Defendant's contention that it was entitled to judgment on the jury's special findings, *non obstante veredicto*, cannot be sustained. The special findings did not acquit the defendant of negligence. In view of what has been said above, all this court can or should do is to reverse the judgment and remand the cause for a new trial.

It is so ordered.