MILLER, Judge.
Minot Hooper Company, Inc., instituted this suit against Crowley Industrial Bag Company, Inc., seeking $13,599.02, representing the amount remaining due after a partial payment on a shipment of 90,112 yards of osnaburg sheeting material ordinarily used by Crowley Industrial Bag Company, Inc., to manufacture sandbags for the U. S. Army. The amount claimed represents the value of material which could not be salvaged when some of the rolls of sheeting caught on fire in the truck of the common carrier, third party defendant Fogleman Truck Lines, Inc.
Defendant, Crowley Industrial Bag Company, Inc., denied owing the obligation and contended that the sheeting had not been cooled before it was rolled and shipped by plaintiff and was, therefore, not fit for the purposes which plaintiff and defendant intended it to be used, and, therefore, was subject to a redhibitory vice. Crowley Industrial Bag Company, Inc., filed a third party demand against Fogleman Truck Lines, Inc., and its liability insurer alleging alternatively that if defendant is indebted to plaintiff, defendant should have judgment against the carrier and its insurer on the *655 theory that the goods were picked up in good condition at Dover, Georgia and remained in the exclusive possession and control of the third party defendant until it was burned, and that the burning resulted from the failure of the carrier to exercise the degree of care imposed by law.
Third party defendant contends that the osnaburg sheeting material had not been properly cooled and had been rolled into rolls on a cardboard core, and as a result of being improperly cooled and rolled, some of the rolls of sheeting in the truck caught fire, which in turn caused other rolls to catch on fire and become damaged. The carrier and its insurer further contended that the damage to the cargo was due entirely to the negligence and acts of the shipper, Minot Hooper Company, Inc., as well as an inherent condition in the cargo, and that there was nothing which it did or which it failed to do which had anything to do with the fire and the partial loss of the cargo. The affirmative negligence and actions of the employees, agents and representatives of Minot Hooper Company, Inc. were alleged to be:
(a) In excessively heating the material, and immediately rolling it tightly on cardboard cores as soon as it came out of the oven;
(b) In failing to air and cool the material prior to tightly rolling it up, and;
(c) In failing to test the heat of the rolls prior to their being loaded on to the truck.
The trial judge for assigned reasons awarded $13,599.02 to plaintiff, and further held that defendant, Crowley Industrial Bag Company, Inc., was entitled to judgment in the same amount plus $61.10 representing additional labor related to a salvage operations, against Fogleman Truck Lines, Inc., and its insurer, Liberty Mutual Insurance Company.
Third party defendants, Fogleman Truck Lines, Inc., and Liberty Mutual Insurance Company, have appealed from the judgment rendered against them in the sum of $13,-660.12. Crowley Industrial Bag Company, Inc., likewise has appealed from the judgment rendered against them.
The trial judge in his well reasoned opinion was impressed by the fact that the carrier had two trucks loaded at approximately the same time with approximately the same load. The other truck delivered the material from Georgia to Crowley, Louisiana, without incident, while this load which sustained the fire damage was delayed approximately four days because of mechanical trouble which developed approximately 80 miles from the point of shipment.
The record establishes that the fire was caused by spontaneous combustion of the material. A description of the material itself and the manner in which it was processed by plaintiff was thoroughly reviewed at the trial.
The finished cotton osnaburg which was to be used by defendant for the manufacturing of the sandbags is constructed by having raw cotton spun into yarn, and this yarn is then sized by adding starches, corn starch and possibly a mildew resistant compound to prevent spoilage, a lubricant and a penetrant. The yard is then mixed with unsized yarn and the fabric is woven, using a filling of unsized yarns. The material is then shipped to the finishing plant, in this case, King Finishing Plant. The first process was for the material to be placed into a copper solution containing aqueous ammonia and a dye. The fabric was dipped into the pan containing the dye and copper solution and was then passed through two squeeze rolls to impregnate this into the fabric. The fabric was then passed over twenty cans with twenty pounds of steam pressure on them and then it enters an oven where hot air was blown onto it. The fabric goes into the oven, which is set for 350 degrees and is reduced approximately 25 degrees in three stages. It flows through the oven at about 120 to 135 yards per minute, and is tightly rolled upon cardboard rolls or cores in bales containing *656 approximately 2000 yards of the material. Most of the bales were 60 inches in width, but some were split in half or about 30 inches wide, but they were all approximately 2000 yards in length. The normal speed for the osnaburg sheeting to go through the ovens would be approximately 130 yards a minute while drying. There were no cooling rolls between the oven and the point where the sheeting was rolled .onto the cardboard cores. The sheeting comes out of the oven at a very high temperature. In fact, according to plaintiff’s expert, the temperature was too hot to lay your hand on the material.
The evidence further discloses that some of the rolls came off the production line and out of the oven on January 17, 1966, and these were loaded on January 18, 1966.
The two expert witnesses presented by defendants, Professors Campbell and Berry of North Carolina, testified that in their opinion the inherent nature of the product which was being hauled, because of the chemicals contained therein, made it subject to spontaneous combustion, and in their opinion the cause of the osnaburg material catching on fire was spontaneous combustion because all of the elements necessary for spontaneous combustion were present. The heating of the fabric and the failure to have it dissipated prior to it being tightly wound causing the heat to be trapped in the bale or roll, would raise the temperature to the ignition point sooner than would otherwise be the case. If the material had been cooled before shipment it might never ignite. The material could have been cooled as it came out of the oven and before it was rolled on the cardboard core, or it could have been cooled before shipment either of which would have greatly decreased the probability of spontaneous combustion. This would be true because if the fabric had been allowed to come to an equilibrium, with respect to temperature, with the surrounding atmosphere before it had been stored in a confined space, the possibility of spontaneous combustion would have been much less. Their opinion is that the fire was caused by the spontaneous combustion of the bales assisted by the added heat of the bales at the time they were shipped.
Even the evidence presented by the plaintiff indicates that the fire was caused as a result of spontaneous combustion brought about as a result of the inherent condition of the material being shipped. Although Mr. Huntsinger, who was qualified by plaintiffs as an expert, testified that he could not assign the cause of the fire, he admitted that since the fabric was rolled on cardboard, charring from the core out would indicate that “spontaneous combustion” took place.
The oils ■ and sizing, or starches and chemicals which were placed in the raw fabric (referred to in the trade as “gray goods”) are not boiled out at his plant because of the use to which this fabric is to be placed. Although he admittedly was not an expert in chemistry, he did state that it was well recognized in the industry that cotton fabrics are subject to spontaneous combustion if oils, metal oxides and similar additives are added to it. That under circumstances which were presented in this case, being closed up in a tight closed place and having an availability of oxygen and having some catalysts present, he realized a danger of spontaneous combustion was created.
We are also impressed with the testimony of defendants’ experts that a test (Mackey test) required by the Army Specifications, indicated that the material is subject to spontaneous combustion. Essentially the test required that some of the material be cooled to room temperature and then placed in the oven heated to 212 degrees for a period of 4 hours.
Thus, we have the testimony of Mr. Berry and Mr. Campbell testifying positively that the cause of the fire was spontaneous combustion brought about by the nature of the goods, i. e., the presence of the iron oxide, waxes and oils and other chemicals in the goods plus the heat being trapped in the *657 bales of material as the material was tightly rolled on the cardboard immediately after coming out of this hot oven and shipped before it was cooled. This testimony is substantiated by the testimony of Mr. Scholl and Mr. Huntsinger when Mr. Scholl testified that the material was charred, or scorched or parched from excessive heat near the core, and Mr. Huntsinger indicated that this would indicate a spontaneous combustion situation.
After the goods were loaded on the truck on Tuesday, January 18, 1966, the truck and van were driven a distance of approximately 80 miles when the differential of the truck tractor began to “tear up.” The truck was driven to East Dublin, Georgia, to the International Harvester dealership to be repaired, and the trailer was parked between the International Harvester repair shop and the City Police Station of East Dublin, Georgia. The van was padlocked and remained there until Saturday morning. It is clear from the evidence that there was no tampering with the load or the van during this four-day layover. The delay in repairing the truck was caused by unavailability of parts. After the tractor had been repaired and as the driver was attaching it to the trailer, he placed his hand on the side of the van, and it felt hot. On unlocking the only door located at the rear of the van, he saw that the load was on fire near the front of the trailer, and, of course, it was smoking. The fire was confined to the inside of the trailer. The merchandise was dumped out of the trailer, and the fire was extinguished by the Fire Department. All of the events of Saturday morning occurred during a heavy rain. All of the goods which could be salvaged were reloaded on the van and returned to plaintiff’s plant in Dover, but plaintiff refused to accept the load because it was too muddy and dirty.
When plaintiff refused ' to clean and process the load the goods were reloaded in the van and driven to Crowley, where they were inspected by Mr. Scholl, general manager for defendant, and the material was then taken to the Crowley Industrial Bag Company, Inc. for salvage operations. Mr. Scholl testified that all the cotton material was burned to some degree, and all of it was wet. Most of it was in sixty inch width rolls. That the damage to more than half of the material was in the form of an inverted cone type damage which obviously started from the core of the roll. Some had external burns apparently caused by fire burning along the outside. The damaged goods were found to have a changing of color from gray-green to brownish, and the closer to the core the more tender and darker it became, and the more there was a loss of tensile strength.
Two subsequent shipments which were not delayed, disclosed similar damage, and since one of the shipment’s damages was negligible no claim was made for it. The other one, which occurred a short time after this incident was substantial and the price for the goods was reduced by plaintiff. In both cases, the material near the core changed color and became darker as it got nearer the core, and it was scorched and parched. The only difference between the two incidents was that in the first one the material caught fire while in the second instance, it had not reached the point where it ignited. However, the material looked the same, and it had similar damage.
While it appears that the fire would not have occurred except for the delays resulting from the mechanical failure, the record is bare of any proof of negligence on the part of the carrier related to this delay.
There was nothing which the driver did or could have done which would have made the condition safer. He did not feel the rolls to see if they were hot as he had hauled some twenty loads before without prior difficulty. He had nothing to do with the loading other than telling plaintiff’s employees how to place the rolls in the van. The stainless steel, plywood lined van was only six months old, and had been swept clean just before it was loaded.
*658 As soon as the driver noticed the mechanical difficulty he stopped at the first city that had an International Harvester dealership; the van trailer was parked next'to the City Police station and across the street from the repair shop; the necessary parts were immediately ordered from Atlanta, Georgia; as soon as the parts arrived they were installed and the driver proceeded to attach the tractor portion of the rig to the van when he felt the heat from the van.
The record does not show that the carrier was put on notice that there was any possibility of spontaneous combustion or that there was any requirement that the goods be delivered within so many hours after shipment. Nor does the record suggest that the carrier was notified that there should be any precautions taken to air or ventilate the van in the event of a four day delay in delivery.
On the contrary, this driver had handled twenty (20) loads similar to this one, all without incident and without having received any suggestion that there might be trouble in the event of delay. There is evidence by plaintiff suggesting that loads have been on the road for four to five days without incident.
There were several factors which caused the fire and resulting damage. One, the nature of the material processed by plaintiff together with the intense heat of the mate-ria! at the time it was tightly wound on a cardboard core. Two, the shipment of the material so soon after manufacture and before it was allowed to cool. And three, the mechanical difficulty which caused the four-day delay in delivering the shipment to the Crowley, Louisiana purchaser.
We are bound to conclude, as did the trial judge, that the fire would not have occurred except for the carrier’s delay for the reason that an identical shipment under similar circumstances arrived without difficulty and in good condition. Plowever, the carrier was not negligent simply because it had mechanical difficulty. Furthermore, the carrier was not negligent in the manner in which it had the mechanical difficulty repaired, or the van stored while the repair was being made.
We find negligence on the part of the shipper plaintiff in failing to advise the carrier that the materials shipped had not been cooled prior to being loaded by plaintiff’s employees and that, therefore, if the shipment could not be promptly delivered, the van should be ventilated.
Since the fabric was being shipped from Dover, Georgia to Crowley, Louisiana, it was an Interstate Commerce shipment. Anderson Clayton & Company v. Yazoo & M.V.R. Company, 174 La. 762, 141 So. 453; Hanley v. Kansas City S. Railway Company, 187 U.S. 617, 23 S.Ct. 214, 47 L.Ed. 333. It is, therefore, controlled by the Acts of Congress interpreted in connection with the common law. Anderson Clayton & Company v. Yazoo & M.V.R. Company, supra, and Chicago & N.W.R. Company v. C. C. Whitnack Produce Company, 258 U.S. 369, 42 S.Ct. 328, 66 L.Ed. 665.
The common carrier, by law, is not liable to the owner for loss of property occurring while the goods were in the hands of the carrier if it is shown that the damage was occasioned (1) by the shipper, (2) an act of God, (3) the public enemy, (4)the public authority, or (5) the inherent nature of the commodity or a latent vice and the rule has been codified by the Carmack Amendment to U.S. Code Title 49, Section 20, Par. (11); Secretary of Agriculture v. United States, Utah 1956, 350 U.S. 162, 76 S.Ct. 244, 100 L.Ed. 173; Illinois Central Railroad Company v. Buckley, 185 So.2d 427 (Miss.).
In Illinois Central Railroad Company v. Buckley (Miss.), the Court indicated that where it was established that the method of transportation was safe for properly cured hay, but the hay was destroyed because of spontaneous combustion *659 since it was moist or undried, there was no responsibility inasmuch as the evidence disclosed that the destruction of or the injury to the goods were due to their inherent nature and qualities. The Court stated:
“We hold that the carrier, appellant in the case at bar, has met the imposed burden and shown that the loss or damage to the hay by heating was caused by vices inherent in the nature and quality of the hay at the time it was loaded and delivered by the appellee to the appellant. The appellant was without fault or negligence on its part which caused or contributed to the damage. Parker Corn Co. v. Chicago, B. & Q. R.R., 120 Kan. 484, 244 P. 240 (1926); Faucher v. Wilson, 68 N.H. 338, 38 A. 1002, 39 L.R.A. 431 (1895); The Ship Howard v. Wissman, 59 U.S. (18 Howard) 231, 15 L.Ed. 363 (1856).”
In 13 C.J.S. Carriers § 79 at p. 152 is found the following:
“Where the destruction of, or the injury to, the goods is due to their inherent nature and qualities, or to defects therein, the carrier is not liable, if its own negligence did not occasion or contribute to the injury. * * * ”
At page 155 the same authority provides:
“Applying the general principles here stated it has been held that the carrier is not liable for loss or injury due solely to such causes as fermentation, depreciation, drying, decay, heating merely as a result of transportation, spontaneous combustion, effervescence, putrefaction, or corrosion or rusting resulting from the chemical union of parts of the goods shipped. * * (Emphasis ours)
In 14 American Jurisprudence, Second Carriers, Section 525 at Page 56 (1964), it is provided:
“A common carrier is not liable as an insurer for the loss of, or injury to, property which arises from the nature and inherent character of the property itself.”
In Anderson Clayton & Company v. Yazoo & M.V.R. Company, supra, the Louisiana Appellate Court held that since it did not appear that the nature of non-contaminated cotton bales was such as to make it subject to spontaneous combustion, the defendant-carrier had failed to prove that the loss arose from the inherent nature of the goods.
However, in this case the undisputed evidence discloses that an inherent condition in the goods caused the fire, i. e., the natural qualities of the goods together with the intense heat of the goods at the time they were tightly wound, and the prompt shipment.
We, therefore, conclude that the proximate cause of the loss was plaintiff’s negligence. But plaintiff contends that there is no showing that its system of manufacture of osnaburg sheeting material differs from any other manufacturer. On the contrary, defendant’s experts indicated that plaintiff’s method of manufacture was similar to that of all other manufacturers. Futhermore, plaintiff shows that the specifications for the material are set by the U.S. Army and that defendant ordered material which would comply with these specifications. Plaintiff further shows that the carrier was selected by defendant and that title to the osnaburg material vested in defendant at the moment the material was loaded on the carrier’s van.
Notwithstanding the correctness of the above contentions, there is nothing to show that defendant was aware that the materials would be shipped before they were allowed to cool. This was solely within the control of plaintiff and we find that plaintiff was negligent in shipping these materials before cooling them.
The shipper of merchandise in delivering goods to be shipped impliedly war *660 rants that the goods were in a condition to withstand shipment and to reach the buyer in a condition fit for the purposes intended. 77 C.J.S. Sales § 326, page 1183; Ernest E. Fadler Co. v. Hesser, 10 Cir., 166 F.2d 904; S. B. Easterly & Son v. Ray, 12 La.App. 87, 123 So. 905; Eastern Motor Express Inc. v. A. Maschmeijer, Jr., Inc., 2 Cir., 247 F.2d 826; Prosser, Law of Torts, 3rd Ed., pages 655 and 656. See also the cases cited in 65 A.L.R.2d 770.
In Eastern Motor Express v. A. Maschmeijer, Jr., Inc., 247 F.2d 826, the Court held:
“Under the common law, a bailor impliedly warrants that the goods are fit for the use for which the bailment is made at least as against latent unfitness. Hoisting Engine Sales Co., Inc. v. Hart, 237 N.Y. 30, 142 N.E. 342, 31 A.L.R. 536. Thus a shipper in delivering packaged goods for shipment impliedly warrants that the containers, if not patently inadequate, are fit for the contemplated shipment. We think that the Packing Rule (Rule 5, subsection 8(a)), makes it plain that a shipper by motor carrier is within that rule. Indeed, the rule of the common law of bailment is peculiarly appropriate for application to the relationship between shippers and common carriers. For such carriers are under obligation to accept for shipment containers which are not patently unfit for such shipment. In this case, the undisputed facts imperatively required a finding that the defendant had breached an implied warranty existing under the common law as recognized by the Packing Rule. As a defense to the plaintiff’s claim of breached warranty, the degree of care exercised by the defendant is irrelevant, for — with exceptions not pertinent here —the duty of the defendant, as bailor-warrantor is absolute. Overbury v. Platten, 2 Cir., 108 F.2d 155, 126 A.L.R. 185; Mulvaney v. King Paint Mfg. Co., 2 Cir., 256 F. 612.”
In this case, the evidence discloses that the most probable cause of the fire was the entrapment of the heat in the tightly bound rolls of the chemically treated material immediately after it came out of the oven, which greatly increased the probability of spontaneous combustion, without which the bales probably would not have reached the ignition point. We find that the manufacturer impliedly warranted to the carrier that the goods would be suitable for shipment in the approved method of shipment, the enclosed vans, and during the length of time that these goods might remain in these vans, without catching on fire and burning. There was also an implied warranty that in baling the material, an excessive amount of heat was not entrapped therein so as to cause them to ignite during the usual and customary period of enclosure in this type of van. The evidence discloses without question that the material was not in this van for an excessively long period of time inasmuch as Mr. Huntsinger, plaintiff’s expert, testified that it was not unusual for material to be placed in these enclosed vans for this period of time.
Since the contract of sale was consummated in the State of Georgia and the incident giving rise to the cause of action arose there, the following Georgia Statute enacted in 1957 is of particular interest, Georgia Code Ann. Sec. 96-307:
The manufacturer of any personal property sold as new property, either directly or through wholesale or retail dealers, or any other persons, shall warrant the following to the ultimate consumer, who, however, must exercise caution when purchasing to detect defects and provided there is no express covenant of warranty and no agreement to the contrary: 1. The article sold is merchantable and reasonably suited to the use intended. 2. The manufacturer knows of no latent defects undisclosed.”
*661 Plaintiff’s negligence hereinabove discussed made the sale of the fabric to defendant subject to the warranty of merchantability as well as the warranty of fitness, and, therefore, makes plaintiff bear the loss since the goods were not merchantable nor were they fit for the intended use, all due to plaintiff’s negligence.
If we apply Louisiana law, a clear case has been established for the partial recision of the sale. If the defect in the goods could have been discovered by the manufacturer by the exercise of utmost human skill and foresight, the manufacturer is responsible for failing to have discovered it. Gordon v. Bates-Cromley Chevrolet Co., La.App., 158 So. 223, affirmed 182 La. 795, 162 So. 624; Samaha v. Southern Rambler Sales, Inc., La.App., 146 So.2d 29.
Here, plaintiff failed to test the fabric prior to making it available for shipment to ascertain the temperature of the material near the core. Had plaintiff done so or had it used cooling racks, the fire would not have ignited. Plaintiff failed to discover that this material was safe to be transported and shipped and it is therefore responsible for the daamges. Samaha v. Southern Rambler Sales, Inc., supra.
It is well recognized in Louisiana that the manufacturer of a product ought to know the qualities, good or bad, of the things which he fabricates in the exercise of the art, craft or business of which he makes public profession and a lack. of such knowledge is imputed to him and renders him liable to the purchaser or anyone using the product for the damages resulting from the vices or defects thereof which he did not make known to them and which they were ignorant of. In fact, the manufacturer is held to have knowledge of even latent defects. LeBlanc v. Louisiana Coca Cola Bottling Co., 221 La. 919, 60 So.2d 873; Tuminello v. Mawby, 220 La. 733, 57 So.2d 666; Doyle v. Fuerst & Kraemer, 129 La. 838, 56 So. 906, 40 L.R.A.,N.S., 480, and cases cited therein; Templeman Bros. Lumber Co., Inc. v. Fairbanks, Morse & Co., 129 La. 983, 57 So. 309.
In all sales in Louisiana there is an implied warranty that the object of the sale is free of a redhibitory vice or defect. LSA-R.C.C. Articles 2475, 2476. Harris v. Automatic Enterprises of Louisiana, Inc., La.App. 4th Cir., 145 So.2d 335; Glenn v. Caire, La.App. 3rd Cir., 164 So.2d 656.
The seller warrants the things sold as fit for the intended purpose. J. B. Beaird Co. v. Burris Bros., 216 La. 655, 44 So.2d 693; Crawford v. Abbott Automobile Co., 157 La. 59, 101 So. 871; E. Levy & Co. v. Pierce, La.App. 2nd Cir., 40 So.2d 818.
For these reasons the judgments appealed from are reversed and judgment is rendered in favor of Crowley Industrial Bag Company, Inc. and against plaintiff Minot Hooper Company, Inc. dismissing its suit. Judgment is also rendered in favor of Fogleman Truck Line, Inc. and Liberty Mutual Insurance Company and against Crowley Industrial Bag Company, Inc. dismissing the third-party action. All costs in both courts are to be paid by Minot Hooper Company, Inc.
Reversed and rendered.
SAVOY, J., dissents, being of the opinion that the judgment of the District Court is correct.